**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

METHOD PHARMACEUTICALS,
LLC,

        Plaintiff,

v.

H-2 PHARMA, LLC,

        Defendant.

Civil Action File No.
  2:20-cv-00753-ECM-SMD

## COMPLAINT FOR DAMAGES & EQUITABLE RELIEF

Plaintiff Method Pharmaceuticals, LLC ("Plaintiff" or "Method") hereby

brings this action to recover damages and other remedies available under the

Lanham Act, 15 U.S.C. § 1125, against Defendant H-2 Pharma, LLC ("H-2" or

"Defendant").

## INTRODUCTION

1.

Method and H-2 are both pharmaceutical manufacturers, labelers, and

distributors who distribute prescription multivitamins with added fluoride. This

action arises out of H-2's knowing and willful false or misleading advertising,

marketing, sale, and promotion of its fluoridated multivitamin products.

2.

For years, H-2 marketed several prescription fluoridated multivitamins with

an "Rx" statement on their labels. For example, this is a picture of one of H-2's

labels:[1]



3.

That "Rx" mark advertised to the market—that is, to wholesalers,

pharmacies, pharmacists, pharmaceutical buyers, prescribers, insurance companies,

and consumers—that H-2's fluoridated multivitamins were prescription drugs.

Prescription drugs must comply with many federal requirements. By placing the

"Rx" mark on its fluoridated multivitamins—and thereby advertising those

products as prescription drugs—H-2 was representing to the market that its

products complied with those requirements. But that representation was false.

---

[1] The "Rx" mark is shown in a red box on each of the labels that appear in this Complaint.
Plaintiff added the red box to clarify where the "Rx" mark appears; the red box does not appear
on the original labels.

2

4.

Among other things, drug manufacturers must comply with the requirement to serialize their drug products to ensure the quality and integrity of the drug supply chain. Manufacturers do that by including a unique serialized numerical identifier, along with the batch and lot numbers and expiration dates for the product on its packaging. Complying with serialization requires manufacturers and others in the supply chain to incur significant costs to ensure the integrity of their products.

5.

H-2 does not serialize its fluoridated multivitamins, despite its representation to the market that those products are drugs that comply with federal serialization requirements.

6.

H-2 falsely advertised its fluoridated multivitamins as drugs that comply with serialization requirements in order to "link" its falsely advertised products with Method's competing drug products in various subscription databases. Pharmacists and other players in the pharmaceutical market use those databases to identify less costly products to fill a prescription. And because H-2 has not incurred the costs associated with serialization, it is able to offer its products at a lower cost and to compete with Method unfairly.

7.

In addition, H-2 has also misleadingly suggested to the market that its multi-vitamins with fluoride are actually FDA-approved products, when they are not. H-2's misleading omissions to the market concerning the approval-status of its multi-vitamins with fluoride, along with the false statement on the labels that the products are drugs, have allowed it to wrongfully undercut Method's position in the market.

8.

H-2's actions constitute false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); contributory false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); and federal unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act.

## PARTIES, JURISDICTION, AND VENUE

9.

Plaintiff Method Pharmaceuticals, LLC is a Texas limited liability company. Method is a specialty pharmaceutical company that develops, labels, distributes, and markets pharmaceutical products. As detailed below, Method is the labeler and distributor for several fluoridated multivitamin products that are at issue in this case.

4

10.

Defendant H-2 Pharma, LLC is a Florida limited liability company with its principal office located at 2010 Berry Chase Place, Montgomery, Alabama 36117. H-2 is the labeler and distributor of several fluoridated multivitamin products that are at issue in this case. H-2 can be served with process through its registered agent, Brooke Tilley, at 2010 Berry Chase Place, Montgomery, Alabama 36117.

11.

This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action presents a federal question.

12.

Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant is a resident of the district and because a substantial part of the events giving rise to the claims against Defendant occurred in this District.

13.

Defendant H-2 is subject to personal jurisdiction in this judicial district and division because its principal offices are located in this district and division.

## FACTUAL BACKGROUND

### *Fluoridated Vitamin Products*

14.

This action involves multivitamins with added fluoride. Multivitamins provide essential vitamins and minerals that are not taken into the body through diet. Fluoride, in turn, strengthens tooth enamel and helps prevent dental decay and cavities.

15.

In most areas of the United States, fluoride is added to the water supply. But that is not always the case. In those areas where fluoride is not added to the water supply, multivitamins with fluoride are used to supplement the diet of infants and children.

16.

Fluoridated multivitamins are also used to prevent tooth decay in people undergoing cancer radiation therapy, which may otherwise increase the risk of tooth decay.

17.

Taking multivitamins with fluoride brings certain risks—particularly the risk of fluorosis, which is an irreversible condition caused by taking too much fluoride. Fluorosis can permanently damage teeth and other cells in the body.

6

18.

Because of these risks, multivitamins with fluoride generally are considered drugs that must be dispensed by prescription. Some manufacturers and labelers, though, offer fluoridated vitamins as dietary supplements that do not have to be dispensed by prescription. And the FDA is yet to weigh in on whether multivitamins with fluoride should be treated as drugs or as dietary supplements. Ultimately, though, whether fluoridated multivitamins are classified as drugs or dietary supplements is irrelevant to this action because H-2 affirmatively advertised its products as drugs.

19.

Method labels and distributes several types of multivitamins with fluoride, including a multi-vitamin with fluoride chewable tablet .25 mg, multi-vitamin with fluoride chewable tablet .5 mg, multi-vitamin with fluoride chewable tablet 1.0 mg, sodium fluoride drops .5 mg, Tri-Vite with fluoride drops .25 mg, Tri-Vite with fluoride drops .5 mg, multi-vitamin with fluoride drops .25 mg, multi-vitamin with fluoride drops .5 mg, and multi-vitamin with fluoride and iron drops .25 mg (collectively, the "Method Products"). The Method Products are labeled as drugs and are available only by prescription.

7

20.

Defendant H-2 also labels and distributes several types of multivitamins with fluoride that compete directly with the Method Products. Specifically, H-2 manufactures and labels a multi-vitamin with fluoride chewable tablet .25 mg, multivitamin with fluoride chewable tablet .5 mg, multi-vitamin with fluoride chewable tablet 1.0 mg, sodium fluoride drops .5 mg, vitamins A, C, and D and fluoride .25 mg, vitamins A, C, and D and fluoride .5 mg, multi-vitamin with fluoride drops .25 mg, multi-vitamin with fluoride drops .5 mg, and multivitamin with fluoride and iron drops .25 mg (collectively, the "H-2 Products"). At least until February 2020, the H-2 Products were also labeled as drugs and available only by prescription.

21.

The H-2 Products compete with the Method Products.

### *The H-2 Products*

22.

At least until February 2020, the labels for the H-2 Products each contained the mark "Rx."

23.

In the pharmaceutical industry, placing an "Rx" on the label is a statement to the market that the product is a prescription drug. And, because prescription drugs

8

must comply with serialization requirements, it is also a statement to the market

that the product complies with, among other things, federal serialization

requirements.

24.

For example, at least until February 2020, H-2's labels for its MultiVitamin

with Fluoride Chewable Tablets in .25 mg, .5 mg, and 1 mg strength each

contained the "Rx" mark. These are images of the relevant labels:







25.

Likewise, until at least February 2020, each of the labels for H-2's

Multivitamin with Fluoride Drops .25 mg and .5 mg, contained the "Rx" mark.

These are images of the relevant labels:





26.

Similarly, until at least February 2020, the labels for H-2's MultiVitamin, Iron and Fluoride Drops .25 mg contained the "Rx" mark and therefore represented to the market that the drops were prescription drugs that complied with federal serialization products. These are images of the relevant labels:



11

27.

And, at least until February 2020, the labels for H-2's Vitamins A, C, D and

Fluoride .25 mg Drops also contained an "Rx" mark and therefore indicated that

they were prescription drugs that complied with federal serialization requirements.

A true and correct copy of that label is shown below:



28.

Similarly, until at least February 2020, the labels for H-2 Sodium Fluoride

Drops .5 mg contained an "Rx" mark and therefore indicated they were

prescription drugs that complied with federal serialization requirements. This is an

image of the relevant labels:



29.

In or around February 2020, H-2 changed the labels for some of the H-2 Products to remove the "Rx" mark. It did this only after Method alerted it to the fact that the "Rx" mark on the label was a false and misleading statement because the H-2 Products did not comply with federal serialization requirements.

30.

Even though H-2 changed the labels for some of the H-2 Products, as of the date of this Complaint, H-2's own website continues to advertise labels for the H-2 Products that include the "Rx" statement. *See, e.g.*, http://www.h2-pharma.com/wp-content/uploads/2017/03/151-01-Final-H2-Label-PI-Rx.pdf. Thus, even today, H-2 continues to advertise the H-2 Products as prescription drugs that comply with federal serialization requirements.

13

31.

And even though H-2 changed the labels for some of the H-2 Products, upon information and belief, there are still H-2 Products with an "Rx" mark on their labels that are in the pharmaceutical supply chain today.

32.

Given H-2's false advertisements that its H-2 Products are prescription drugs that comply with federal serialization requirements, its continued use of the "Rx" mark on its website, and the existence of H-2 Products with "Rx" on their labels in the supply chain, there is a cognizable danger that H-2 will again offer H-2 Products with the false statement "Rx" on their labels.

## *Federal Serialization Requirements*

33.

When they are offered as prescription drugs, multivitamins with fluoride (in whatever form), are subject to federal serialization requirements under the Drug Quality and Security Act.

34.

Congress passed the Drug Quality and Security Act in 2013, in part to address the issue of counterfeit drugs and drug adulteration.

14

35.

Title II of the Drug Quality and Security Act is the Drug Supply Chain Security Act, which outlines the steps to build an electronic system to identify and trace prescription drugs as they are manufactured and distributed throughout the United States.

36.

A key component of the Drug Supply Chain Security Act is serialization—that is, the placing of a unique product identifier on prescription drugs.

37.

To serialize their products, manufacturers, labelers, and distributors are required to place a standardized numerical identifier on each product package, which consists of the drug's national drug code and a unique alphanumeric serial number, the product's lot number, and the product's expiration date.

38.

With few exceptions not relevant here, the Drug Supply Chain Security Act requires serialization for all prescription drugs in finished dosage form.

39.

Under the Drug Supply Chain Security Act, H-2 was required to ensure that the H-2 Products complied with federal serialization requirements as of November

15

2017. That is, if the H-2 Products were the prescription drugs that H-2 advertised them to be, then beginning in November 2017, they should have been serialized.

40.

For drug labelers like Method and H-2, implementing serialization is an expensive proposition. Labelers must update their products' labels and ensure that manufacturers properly affix them to the products. Serialization causes increased costs in technology, equipment, and data management, among other things.

41.

A 2014 report from the Pew Charitable Trusts estimated that per product line, manufacturers expended an average of $1.4 million to implement the federal serialization requirements. For medium-size manufacturing companies, the average implementation cost was $36 million in total. And even after implementation costs, manufacturers estimated spending another $7.2 million annually to comply with serialization requirements. *See* https://www.pewtrusts.org/-/media/assets/2014/ 04/29/boozallenhamiltonreport.pdf.

42.

Method incurred (and continues to incur) significant costs to ensure that the Method Products comply with the federal serialization requirements.

16

43.

H-2, however, does not and did not comply with the serialization requirements for the H-2 Products, despite advertising its products as prescription drugs. In particular, H-2 does not include a standardized numerical identifier consisting of the product's national drug code and a unique alphanumeric serial number on each package of the H-2 Products. Instead, H-2 provides only the lot and expiration number.

44.

Below is a true and correct example of packages for some of the H-2 Products (H-2's MultiVitamin with Fluoride in .25 and .5 mg strengths) that were represented to be prescription drugs and therefore should have—but did not— contain a standardized numerical identifier:

17









45.

Because H-2 does not comply with the federal serialization requirements for the H-2 Products, H-2 has not had to incur the costs associated with serialization. Cutting corners to avoid these costs allows H-2 to offer the H-2 Products at a lower price than Method is able to offer the Method Products.

### *Listing with Drug Databases*

46.

In an effort to take part or all of the market share away from Method, H-2 listed the H-2 Products with subscription pharmaceutical drug databases, including Medi-Span and First DataBank (collectively, the "Drug Databases"), on or around December 2016 or January 2017.

47.

The Drug Databases are subscription-based drug information and interactions compendia that are used nationwide by healthcare professionals, insurers, payers, pharmaceutical manufacturers, and others to evaluate medications that currently are on the market.

48.

The Drug Databases are also used by pharmacies to determine whether pharmaceutically equivalent products are available for substitution.

Pharmaceutically equivalent products are those that contain the same active ingredients, in the same amounts, and in the same dosage forms.

49.

Pharmaceutical products that are labeled as pharmaceutically equivalent are "linked" to one another in the Drug Databases.

50.

Upon information and belief, products listed as drugs can be linked only with other drugs, whereas products listed as dietary supplements can be linked only with other dietary supplements.

51.

The linking of products within the Drug Databases is used by pharmacies, pharmacists, wholesalers, pharmaceutical buyers, insurance companies, and others to determine whether there are any pharmaceutically equivalent alternatives available for a particular product.

52.

When two products are linked in a Drug Database, pharmacies, pharmacists, wholesalers, and others typically will purchase the lower-cost product.

53.

Upon information and belief, listings for the H-2 Products appeared on the Drug Databases on or around December 2016 or January 2017.

21

54.

Upon information and belief, when it listed its H-2 Products with the Drug

Databases, H-2 provided the Drug Databases with the labels and package inserts

for the H-2 Products.

55.

According to their labels and package inserts, the H-2 Products contain the

same active ingredients, in the same amount, and in the same dosage form as

Method's Products.

56.

Also according to their labels and package inserts, the H-2 Products are

prescription drugs because they contain an "Rx" mark. Method's Products are

offered as prescription drugs. By falsely advertising the H-2 Products as

prescription drugs, H-2 was able to get its H-2 Products linked in the Drug

Databases with Methods Products.

57.

In order to get the H-2 Products linked with the Method Products in the

Medi-Span database, H-2 falsely and misleadingly represented to Medi-Span that

its products were prescription drugs that complied with federal serialization

requirements by submitting drug labels with an "Rx" mark.

58.

H-2 falsely or misleadingly advertised the H-2 Products as prescription drugs that complied with federal serialization requirements directly to the pharmaceutical industry, including to potential purchasers.

59.

H-2 encouraged the false impression in the pharmaceutical market that the H-2 Products were prescription drugs that complied with federal serialization requirements.

60.

H-2's advertising and promotion of the H-2 Products as prescription drugs has falsely or misleadingly deceived the pharmaceutical supply chain to believe that the products comply with the federal serialization requirements.

61.

Based upon H-2's advertising and promotion of the H-2 Products as prescription drugs to those in the pharmaceutical supply chain, relevant market players believe that the H-2 Products comply with federal serialization requirements.

62.

These relevant market players, including wholesalers, distributors, pharmacies, pharmacists, insurers and others, are being deceived into believing the

23

H-2 Products are prescription drugs that comply with federal serialization requirements.

63.

Notwithstanding H-2's advertising and promotion efforts, the H-2 Products do not comply with federal serialization requirements.

64.

Based on the representations on the products' labels and package inserts, the Method Products and the H-2 Products have become linked to each other in the Drug Databases.

65.

Because H-2 has not incurred the costs associated with complying with federal serialization requirements and is therefore able to offer the H-2 Products at a lower price, pharmacies, pharmacists, wholesalers, and other pharmaceutical buyers have been and will continue to substitute the H-2 Products for Method's Products.

66.

Upon information and belief, the H-2 Products also appear on the pharmaceutical dispensing software of major pharmacies, including CVS and Walgreens.

24

67.

Believing the H-2 Products to be prescription drugs that comply with federal serialization requirements, pharmacists automatically substitute the H-2 Products for Method's Products when they fill a prescription for a fluoridated multivitamin product.

68.

H-2's promotion, marketing, and listing of the H-2 Products as prescription drugs that comply with federal serialization requirements are false or misleading and have caused irreparable injury to Method and will continue to both damage Method and to deceive and potentially harm the public unless enjoined by this Court.

69.

Method has been and will be harmed by H-2's false or misleading representations. H-2's efforts have and will continue to mislead consumers into believing that the H-2 Products are prescription drugs that comply with federal serialization requirements and that they are an appropriate substitute for the Method Products.

70.

As a result of H-2's false or misleading representations to the Drug Databases, Method has lost sales and will continue to lose sales.

25

***DailyMed***

71.

The United States National Library of Medicine maintains a website at dailymed.nlm.nih.gov ("DailyMed") that is the official provider of FDA label information and package inserts.

72.

The drug labeling information on DailyMed is the most recent submitted to the Food and Drug Administration and is updated daily by the FDA.

73.

DailyMed provides health-information providers and the public with a standard, comprehensive, up-to-date, look-up and download resource of medication content and labeling.

74.

Upon information and belief, on or around December 2016 or January 2017, a listing for the H-2 Products appeared on DailyMed with a marketing start date of January 4, 2017.

75.

Copies of the H-2 Products' labels and package inserts were and are available on the DailyMed website.

76.

Upon information and belief, to list the H-2 Products on DailyMed, despite including an "Rx" mark on the labels, H-2 indicated that its products were dietary supplements, rather than unapproved drugs.

77.

When unapproved drugs are listed on the DailyMed website, they contain the following warning: "Disclaimer: This drug has not been found by FDA to be safe and effective, and this labeling has not been approved by FDA."

78.

This warning appears on the DailyMed listings for Method's Products but does not appear on the DailyMed listings for the H-2 Products.

79.

The absence of this warning on DailyMed for the H-2 Products, combined with the fact that the labels for the H-2 Products (which are also available on the DailyMed website) advertise the products as prescription drugs, creates the false and misleading impression that the H-2 Products have been approved by the FDA and have been determined by the FDA to be safe and effective.

80.

The false or misleading listing of the H-2 Products with the FDA through its
DailyMed website has been transmitted throughout the pharmaceutical supply
chain and to Method's customers throughout the United States.

81.

The FDA-approval status of a drug is a material consideration in the
market's purchasing decisions because an FDA-approved drug is more likely to be
purchased than a non-approved product of the same formula.

82.

Method will suffer an immediate and substantial loss in market share as a
direct result of H-2's false an or misleading representations about the H-2
Products.

83.

Wholesalers and pharmacies have reduced and likely will continue to reduce
inventories of the Method Products as a result of the marketing and availability of
the H-2 Products.

## COUNT I

**False Advertising in Violation of the Lanham Act Section 43(a)(1)(B)
(15 U.S.C. § 11.25(a)(1)(B))**

84.

Method hereby incorporates and restates Paragraphs 1 through 83 as if fully set forth herein.

85.

H-2 promoted and advertised the H-2 Products to wholesalers and throughout the pharmaceutical supply chain by listing the products in the Drug Databases and on DailyMed.

86.

In H-2's promotions and advertisements with the Drug Databases and on DailyMed, H-2 represented that the H-2 Products are FDA-approved prescription products that comply with federal serialization requirements. These promotions and advertising were false or misleading.

87.

H-2 made its promotions and advertisements of the H-2 Products as prescription drugs that comply with federal serialization in an attempt to link its products with the Method Products and wrongfully undercut Method's market share.

88.

H-2's statements have actually deceived or have the tendency to deceive a substantial segment of their audience as to the nature, quality, and characteristics of the H-2 Products.

89.

H-2's false or misleading claims about the H-2 Products are material and have influenced and likely will continue to influence the purchasing decisions of wholesalers, third-party payors, pharmacists, healthcare professionals, insurers, prescribers, and others in the pharmaceutical industry, as well as patients or caregivers of patients who consume Method's products.

90.

H-2's false or misleading representations were and are made in interstate commerce.

91.

As a direct and proximate result of H-2's conduct, Method has suffered and is continuing to suffer irreparable injury, which Method would not have experienced but for the false or misleading representations by H-2.

92.

In accordance with 15 U.S.C. § 1116, Method is entitled to permanent injunctive relief to abate H-2's continuing acts.

93.

In accordance with 15 U.S.C. § 1117, Method is entitled to recover all damages sustained as a result of H-2's actions, the profits realized by H-2 through its false or misleading advertising of the H-2 Products, and the costs of this action.

94.

H-2's actions have been willful and deliberate, entitling Method to recover treble damages or profits.

95.

In addition, this is an exceptional case under 15 U.S.C. § 1117(a), which entitles Method to treble damages and an award of its reasonable attorneys' fees and expenses of litigation.

## COUNT II

### Contributory False Advertising in Violation
### of the Lanham Act Section 43(a)(1)(A)
### (15 U.S.C. § 1125(a)(1)(A))

96.

Method hereby incorporates and restates Paragraphs 1 through 83 as if fully set forth herein.

97.

Upon information and belief, H-2 is knowingly inducing or causing, or materially participating in, the false or misleading advertising and promotion of the

H-2 Products by Drug Databases, pharmacies, or other members of the pharmaceutical industry as FDA-approved drugs that comply with federal serialization requirements.

98.

Upon information and belief, H-2 knew or intended to participate in the false advertising of the H-2 Products by Drug Databases, pharmacies, insurers, or other members of the pharmaceutical industry.

99.

Upon information and belief, H-2 actively and materially furthered such false or misleading advertising and promotion of the H-2 Products by making false or misleading representations about the products on their labels and product inserts, making false or misleading representations to the Drug Databases to list the H-2 Products with the Drug Databases, listing the products with the Drug Databases, or marketing the products as prescription drugs that comply with federal serialization requirements.

100.

Such false or misleading statements about the H-2 Products by Drug Databases, pharmacies, insurers, or other members of the pharmaceutical industry have actually deceived or have the tendency to deceive a substantial segment of their audience as to the nature, quality, and characteristics of the H-2 Products.

32

101.

Such false or misleading statements about the H-2 Products by Drug

Databases, pharmacies, or other members of the pharmaceutical industry are

material and likely to influence the purchasing decisions of wholesalers, third-party

payors, pharmacists, healthcare professionals, and others in the pharmaceutical

industry, as well as patients who consume the Method Products.

102.

These false or misleading representations were and are made in interstate

commerce.

103.

As a direct and proximate result of H-2's conduct, Method has suffered

damages, including (but not limited to) a loss of sales, profits, and customers.

104.

H-2's actions have caused, are causing, and will continue to cause

irreparable harm and inherently unquantifiable injury and harm to Method's

business, reputation, and goodwill, unless H-2's unlawful conduct is enjoined by

this Court.

105.

Under 15 U.S.C. § 1116, Method is entitled to preliminary and permanent

injunctive relief to abate H-2's continuing acts.

106.

Under 15 U.S.C. § 1117, Method is entitled to recover all damages caused

by H-2's actions, the profits realized by H-2, and the costs of this action.

107.

H-2's actions have been willful and deliberate, entitling Method to recover

treble damages or profits. In addition, because this is an exceptional case under 15

U.S.C. § 1117(a), Method is entitled to treble damages and an award of reasonable

attorneys' fees and litigation expenses.

## COUNT III

## Unfair Competition in Violation of the Lanham Act Section 43(1)(1)(A) (15 U.S.C. § 1125(A)(1)(A))

108.

Upon information and belief, H-2's use of false or misleading information

on the product labels, package inserts, and other marketing materials for the H-2

Products have caused and are likely to continue to cause confusion or mistake, or

to deceive prospective or actual customers and other members of the public as to

the source, origin, sponsorship, or approval of H-2's products.

109.

Upon information and belief, H-2's false or misleading representations to

wholesalers and throughout the pharmaceutical supply chain that the H-2 Products

are FDA-approved prescription drugs that comply with federal serialization

34

requirements have caused and are likely to continue to cause confusion or mistake, or to deceive prospective or actual customers and other members of the public as to the source, origin, sponsorship, or approval of H-2's products.

110.

As a direct and proximate result of H-2's conduct, Method has suffered damages, including (but not limited to) a loss of sales, profits, and customers.

111.

H-2's actions have caused, are causing, and will continue to cause irreparable and inherently unquantifiable injury and harm to Method's business, reputation, and goodwill.

112.

Under 15 U.S.C. § 1116, Method is entitled to permanent injunctive relief to abate H-2's continuing acts.

113.

Under 15 U.S.C. § 1117, Method is entitled to recover all damages sustained by H-2's actions, the profits realized by H-2, and the costs of this action.

114.

H-2's actions have been willful and deliberate, entitling Method to recover treble damages or profits. In addition, because this is an exceptional case under 15

U.S.C. § 1117(a), Method is entitled to treble damages and an award of reasonable attorneys' fees and litigation expenses.

## JURY DEMAND

Method demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Method prays that the Court enter judgment in its favor and grant the following relief:

a.      Compensatory damages, consisting of general and special damages, in an amount to be proven at trial;

b.      an award of all damages available under 15 U.S.C. § 1117;

c.      treble damages under 15 U.S.C. § 1117;

d.      a permanent injunction enjoining H-2, and all others acting in privity or in concert with it, from representing or advertising the H-2 Products as prescription drugs without first complying with federal serialization requirements;

e.      a permanent injunction enjoining H-2, and all others acting in privity or in concert with it, from listing the H-2 Products in the industry price lists or databases, including Medi-Span and First Databank, unless and until H-2 complies with the federal serialization requirements;

36

f.      a permanent injunction enjoining H-2, and all others acting in privity

or in concert with it from further advertising or marketing the H-2 Products with

any false or misleading, or false and misleading, statements;

g.      an award of reasonable attorneys' fees and costs in prosecuting this

action in accordance with 15 U.S.C. § 1117; and

h.      such other relief as the interests of justice may require.


Submitted this 18th day of September, 2020.

Lee H. Copeland (ASB-3461-o72l)
Copeland, Franco, Screws & Gill, P.A.
444 S. Perry Street (36104)
Post Office Box 347
Montgomery, AL 36101-0347
T: 334/834-1180   F: 334/834/3172
Email:  copeland@copelandfranco.com

James W. Cobb
Georgia Bar No. 420133
(pro hac vice application forthcoming)
Julia B. Stone
Georgia Bar No. 200070
(pro hac vice application forthcoming)

**CAPLAN COBB LLP**
75 Fourteenth Street, NE, Suite 2750
Atlanta, Georgia 30309
Tel: (404) 596-5600
Fax: (404) 596-5604
jcobb@caplancobb.com
jstone@caplancobb.com

*Counsel for Plaintiff*
*Method Pharmaceuticals LLC*

**Service on Defendant via Certified Mail**

H-2 Pharma, LLC
c/o Brooke N. Tilley (Registered Agent)
2010 Berry Chase Place
Montgomery, AL 36117