IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

METHOD PHARMACEUTICALS, LLC,    )
                                )
          Plaintiff,            )
                                )
     v.                         )    CIVIL CASE NO. 2:20-cv-753-ECM
                                )              [WO]
H2-PHARMA, LLC, *et al.*,        )
                                )
          Defendants.           )

## MEMORANDUM OPINION and ORDER

## I.  INTRODUCTION

This case concerns Plaintiff Method Pharmaceutical, LLC's ("Method") claims for false and misleading advertising against Defendants H2-Pharma, LLC ("H2") and Brooke Cantey ("Cantey") (collectively, "Defendants").  On December 14, 2023, Method filed its Second Amended Complaint ("SAC").  Now pending before the Court are motions to dismiss filed by H2, (doc. 188), and Cantey, (doc. 191), and a conditional motion for leave to file a third amended complaint filed by Method, (doc. 209).  After carefully reviewing the parties' briefing, the Court concludes that the motions to dismiss are due to be GRANTED in part to the extent that Count Four is due to be dismissed as to both Defendants and DENIED in all other respects, and the motion for leave to file a third amended complaint is due to be DENIED.

## II.  LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that

the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (alteration in original) (citation omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555–56. This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.*

### III.  STATEMENT OF FACTS[1]

Both Method and H2 are manufacturers, labelers, and distributors of prescription fluoride products. On September 18, 2020, Method filed claims for false advertising and unfair competition under the Lanham Act against H2 for the marketing of its fluoride

---

[1] This recitation of the facts is based on Method's SAC. (Doc. 1). The Court recites only the facts pertinent to resolving the Defendants' motions to dismiss. For purposes of ruling on the motion, the facts alleged in the complaint are accepted as true, and the facts and reasonable inferences drawn therefrom are set forth in the light most favorable to Method.

products.   After a year and a half of discovery, Method filed its Second Amended Complaint ("SAC") and added Brook Cantey, President of H2, as a defendant.  The SAC, taken in the light most favorable to Method, establishes the following facts.

Fluoride products can be offered by either prescription drug or dietary supplement. If a product is a prescription drug, drug manufacturers like Method must comply with certain federal requirements, including "serialization."  Serialization is the placement of a unique product identifier on drugs so they can be identified and traced throughout the system, and it imposes a significant cost on manufacturers.  Method offers its fluoride products as prescription drugs and thus complies with federal requirements for prescription drugs, including serialization.

H2 also markets several fluoride products, but H2's products do not comply with serialization or other federal requirements for prescription drugs.  Method claims that despite H2's noncompliance, it represents to the market that its fluoride products comply prescription drug requirements.  Until at least February 2020, H2 marketed its fluoride products with an "Rx" symbol on the label.  Cantey drafted, designed, and approved the final versions of these labels, and filled out forms intended only for "Rx only" products. These labels and forms represented to the market that these products complied with requirements for prescription drugs.  According to Method, because of this false and misleading advertising, H2 was able to "link" its products with Method's on pharmaceutical databases, which market participants use to choose products.

H2's website also represents that its fluoride products have National Drug Codes ("NDCs"), and Cantey represented in emails and offer letters that H2's fluoride products

have NDCs.  NDCs are only available for prescription drug products, and H2's fluoride products do not have NDCs.  Method also alleges that H2 indicated to DailyMed, the United States National Library of Medicine's official provider of FDA label information, that its products were dietary supplements, despite leading the market to believe that its products were prescription drugs that complied with federal serialization requirements. Because of this representation, DailyMed omitted a disclaimer that was placed on Method's products, which warns that the product has not been found to be safe and effective by the FDA.

Method alleges that the "Rx" symbol on H2's labels and website, combined with the various representations that its fluoride products have NDCs, represents to the market that H2's fluoride products comply with requirements for prescription drugs.  Further, these facts and the lack of a disclaimer on DailyMed lead consumers to believe that H2's products are FDA-approved, which is a material consideration to consumer's purchasing decisions.  Because H2 does not comply with requirements for prescription drugs, like serialization, it avoids the costs associated with compliance and is able to charge lower prices for its fluoride products than Method.  Consequently, pharmacists, wholesalers, and other buyers choose H2's fluoride products over Method's, while believing H2's products to be in compliance with serialization requirements.

In February 2020, H2 removed the Rx mark from some of its labels, but H2's website continued to advertise fluoride products with the label containing the Rx mark until sometime in 2023.  Further, labels with the Rx mark still remain in the pharmaceutical

supply chain today, and Cantey continues to use nonexistent NDCs in her communications with market participants.  As a result, Method lost and will continue to lose sales.

Method first brings a claim for false advertising under 15 U.S.C. § 1125(a)(1)(B) against H2 and Cantey, alleging that H2, as directed and authorized by Cantey, advertised its products to drug databases as being in compliance with federal serialization requirements in an attempt to link its products with Method's products.  Count Two brings a claim against H2 alone for false advertising under 15 U.S.C. § 1125(a)(1)(B) for advertisements on DailyMed, alleging that H2 falsely advertised its products as being FDA-approved.  Count Three alleges Contributory False Advertising in violation of 15 U.S.C. § 1125(a)(1)(A) against both H2 and Cantey, for knowingly causing or participating in this misleading advertising by databases and DailyMed.  Count Four brings a claim for unfair competition against all Defendants under 15 U.S.C. § 1125(A)(1)(A), alleging that H2 and Cantey used false or misleading information on marketing materials to cause confusion or mistake as to the source, origin, sponsorship, or approval of H2's products.

## IV. DISCUSSION

The Defendants bring a variety of arguments as to why the SAC should be dismissed.  Together, they argue that Method has not plausibly alleged a claim under the Lanham Act; Method requests injunctive relief that is inappropriate for the Court to provide; Method's allegations are insufficient to create individual liability as to Cantey; and Method's claims are barred by the statute of limitations and the doctrine of laches.

In its response, Method first requests that this Court deny H2's motion because it is an improper successive Rule 12 motion under Rule 12(g). (Doc. 210 at 18).  Further,

Method argues that both motions should be denied because they rely on facts beyond the complaint, relitigate positions that this Court has already considered and rejected, and misrepresent the allegations in the SAC. (*See generally* doc. 210).  The Court addresses each argument in turn.

### A. Successive Rule 12 Motion

H2 previously filed a motion under Rule 12 in response to the first amended complaint. (Doc. 15).  Method argues that H2's latest motion is an improper successive motion under Rule 12(g).  Under Rule 12(g), "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under [Rule 12] must not make another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion." FED. R. CIV. P. 12(g)(2).  "In other words, unless one of the specified exceptions applies, a party cannot raise a defense in a second Rule 12 motion that it failed to raise in its first Rule 12 motion." *Brooks v. Warden*, 706 F. App'x 965, 968 (11th Cir. 2017).[2] Method argues that because the claims against H2 remain unchanged in the SAC, all of the arguments it brings in its motion "were available to it when it last moved to dismiss," and neither Rule 12(h)(2) nor (3) saves its motion. (Doc. 210 at 10).

Rule 12(h)(3) "exempts from waiver or forfeiture motions to dismiss for lack of subject-matter jurisdiction." *Brooks v. Warden*, 706 F. App'x 965, 969 (11th Cir. 2017) (citing FED. R. CIV. P. 12(h)(3)).  H2 does not move to dismiss for lack of subject matter jurisdiction, and therefore its motion does not fall within this exception.  Rule 12(h)(2)

---

[2] The Court here, and elsewhere in the opinion, cites to non-binding authority.  While the Court recognizes that these cases are not precedential, the Court finds them persuasive.

states that the defense of failure to state a claim or other legal defense may be raised (1) in any pleading; (2) in a motion for judgment on the pleadings; (3) or at trial. FED. R. CIV. P. 12(h)(2).  If Rule 12(h)(2) does not apply, a defense or objection in a motion is subject to Rule 12(g)(2).  H2 does not bring its defenses pursuant to any of the methods set out in Rule 12(h)(2).  Thus, it is subject to the limitations in Rule 12(g), and H2 is deemed to have waived any "defense or objection that was available to [it] but omitted from its earlier motion." FED. R. CIV. P. 12(g)(2).

Cantey, however, incorporates all of H2's arguments into her own motion, which does not qualify as a successive motion because this is her first Rule 12 motion in this case.[3]  Thus, regardless of whether Rule 12(g)(2) bars H2's motion, the Court evaluates the arguments raised by both H2 and Cantey.  Further, the Court finds H2's arguments to be unsuccessful as to Counts One, Two, and Three, and consequently, whether H2's motion is an improper successive motion is only relevant as to Count Four of the SAC.

As explained below, the Court finds that the claim of unfair competition is due to be dismissed.  This claim has remained the same against H2 throughout this litigation, (*compare* doc. 13, *with* doc. 159), and consequently, the arguments that H2 makes now as to Count Four were also available to it when it filed its first Rule 12 motion. *United Fire & Cas. Co. v. Progressive Express Ins. Co.*, 2020 WL 11421205, at *2 (M.D. Fla. June 15, 2020) ("[T]he 'filing of an amended complaint d[oes] not revive [d]efendant's ability to

---

[3] The Court cautions the Defendants against incorporating wholesale another party's motion into their own in the future, as the Court disfavors this practice.

file a motion to dismiss for failure to state a claim because this defense was available but omitted from its earlier motion.'" (second alteration in original) (citation omitted)).

Although H2's motion is an improper successive motion, Cantey is permitted to make these arguments, and she sufficiently does so by incorporating H2's motion into her own.  "The purpose of Rule 12(g)(2) is to avoid unnecessary delay at the pleading stage by encouraging 'the presentation of an omnibus pre-answer motion in which the defendant advances every available Rule 12 defense and objection he may have that is assertable by motion.'" *Hummel v. Tamko Bldg. Prod., Inc.*, 2016 WL 7340301, at *4 (M.D. Fla. Mar. 28, 2016) (citing CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 5C FEDERAL PRACTICE & PROCEDURE § 1384 (3d ed. 2014)).  No unnecessary delay is created by also considering the arguments regarding Count Four as they pertain to H2.  Because the arguments speak to the insufficiency of Count Four generally, rather than against Cantey individually, the Court in its discretion will consider the arguments regarding Count Four as to both Defendants and ultimately concludes that Count Four is due to be dismissed as to both Defendants. *Fernau v. Enchante Beauty Prod., Inc.*, 847 F. App'x 612, 620 (11th Cir. 2021) (per curiam) ("[A] district court's decision to consider a successive Rule 12(b)(6) motion to dismiss is usually harmless, even if it technically violates Rule 12(g)(2).  So long as the district court accepts all of the allegations in the complaint as true, the result is the same as if the defendant had filed an answer admitting these allegations and then filed a Rule 12(c) motion for judgment on the pleadings, which Rule 12(h)(2)(B) expressly permits.").

**B. Exhibits**

The Defendants offer forty-two exhibits—567 pages in total—for the Court's consideration.  Method opposes the introduction of these exhibits.  "Generally, when considering a motion to dismiss, the district court must limit its consideration to the pleadings and any exhibits attached to it." *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023) (citing *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000)).  "If the parties present, and the court considers, evidence outside the pleadings, the motion to dismiss generally must be converted into a motion for summary judgment." *Baker*, 67 F.4th at 1276 (first citing FED. R. CIV. P. 12(d); then citing *Finn v. Gunter*, 722 F.2d 711, 713 (11th Cir. 1984)).

However, "[t]here are two exceptions to [the] conversion rule: (1) the incorporation-by-reference doctrine and (2) judicial notice." *Baker*, 67 F.4th at 1276 (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).  First, the Defendants argue that the Court can take judicial notice of publications by the FDA, NIH, and DailyMed websites because they are "official publications of the U.S. Government." (Doc. 188 at 13).  Second, they argue that various documents and instruction manuals from the Medispan and First Data Bank drug databases can be considered under the incorporation by reference doctrine. (Doc. 188 at 15).  The Court considers each argument in turn.

*1. Judicial Notice*

"A district court may take judicial notice of public records without converting a motion to dismiss into a motion for summary judgment." *McCone v. Thorpe*, 828 F. App'x 697, 698 (11th Cir. 2020) (per curiam) (first citing FED. R. EVID. 201(b); then citing *Bryant*

9

*v. Avado Brands, Inc.*, 187 F.3d 1271, 1278–80 (11th Cir. 1999)).  "The party requesting judicial notice bears the burden of persuading the court" that judicial notice is appropriate. *Couch v. Broward Cnty.*, 2012 WL 2007148, at *1 (S.D. Fla. June 5, 2012) (citation omitted).  The Defendants argue that the Court can take judicial notice of certain facts taken from the FDA, NIH, and DailyMed websites because they are official publications of the U.S. Government.  In support, the Defendants cite to *Banks v. Cnty. of Allegheny*, 568 F. Supp. 2d 579 (W.D. Pa. 2008).  In *Banks*, the court found that the plaintiff failed to state a claim of deliberate indifference where he told a nurse he was allergic to penicillin and was prescribed doxycycline. *Id.* at 597.  The court took judicial notice of the fact that doxycycline is not related to penicillin, where DailyMed stated that the class of drugs to which doxycycline belongs "is often used as an alternative drug for people who are allergic to penicillin." *Id.*  As explained below, the Court finds *Banks* distinguishable from this case.

For the Court to take judicial notice of a fact, it "[can]not [be] subject to reasonable dispute," but instead must "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Ellison v. Postmaster Gen., United States Postal Serv.*, 2022 WL 4726121, at *6 (11th Cir. Oct. 3, 2022) (citing FED. R. EVID. 201(b)(2)); *Lett v. Alfa Ins. Co.*, 2022 WL 4091855, at *3 (M.D. Ala. Aug. 15, 2022), *report and recommendation adopted*, 2022 WL 4087497 (M.D. Ala. Sept. 6, 2022) (taking judicial notice of a party's state of incorporation, which is publicly available on the Alabama Secretary of State's website, for purpose of determining diversity jurisdiction). Judicial notice is appropriate only if "particular facts are outside the area of reasonable

controversy," and "[a] high degree of indisputability is the essential prerequisite." FED. R. EVID. 201(a) advisory committee's notes to 1972 proposed rules.

The Defendants ask the Court to take judicial notice of facts that are not "accurately and readily determined" from their respective sources. They seek to establish that Method's "claims are unsupported by the Parties' evidence to date" and thus implausible. Cantey contends that these exhibits show "that no customer of H2's fluoride products could have possibly been misled about the identification numbers used to identify H2's products." (Doc. 191 at 14). H2 argues that in the "full context" of its attached exhibits, "it is obvious that any allegation that H2 somehow misled any market participant or made any misrepresentation to damage Method is utterly implausible," and that "Method's entire business model is to create copycat products, link them in drug databases, and steal market share from the legacy market participants." (Doc. 188 at 6).[4]

To reach these conclusions, the Defendants ask the Court to draw inferences from the exhibits which are, at best, not in Method's favor, and, at worst, dubious. For example, H2 contends that "the FDA has already provided guidance determining that the use of the letters 'Rx' as part of dietary supplement labeling does not independently constitute a representation that a product is . . . an approved prescription drug." (Doc. 188 at 24 (citing U.S. FOOD & DRUG ADMIN., SMALL ENTITY COMPLIANCE GUIDE ON STRUCTURE/FUNCTION CLAIMS (2002),

---

[4] In support of this proposition, H2 also cites to the trial testimony of "Matthew Scott Tucker" and "Christopher Boone" from another case involving Method. Neither Defendant provides an explanation for why the Court can consider the testimony of these individuals at this stage. Thus, the Court declines to consider this evidence.

https://www.fda.gov/regulatory-information/search-fda-guidance-documents/small-entity
-compliance-guide-structurefunction-claims)).   Yet the exhibit to which H2 cites for this
proposition states that "the use of [the Rx symbol] on dietary supplements may deceive
consumers into thinking they are purchasing a prescription drug without a
prescription . . . if, in the context of the labeling as a whole, the terms imply that the product
is a prescription drug." *Id.*   In another instance, H2 asks the Court to take judicial notice of
the fact that Monarch PCM, LLC, which is supposedly Method's manufacturer, was not in
compliance with Current Good Manufacturing Practice ("CGMP") regulations based on an
FDA warning letter.   Consequently, they argue, because Method did not allege that H2 was
not in compliance with CGMP, Method cannot plausibly allege that H2 has a competitive
advantage. (Doc. 188 at 26–27).   The Defendants' request for judicial notice goes too far,
particularly at this stage of the litigation, and the Court finds that the Defendants have not
shown that judicial notice is appropriate in this instance.

### 2. *Incorporation by Reference*

The Defendants then argue that the "Court may consider information from the
Medispan [and] First Data Bank drug databases, including their instruction manuals,"
under the incorporation by reference doctrine. (Doc. 188 at 15).   The Court can consider
exhibits under the incorporation by reference doctrine when a "a plaintiff refers to a
document in its complaint, the document is central to its claim, its contents are not in
dispute, and the defendant attaches the document to its motion to dismiss." *Fin. Sec. Assur.,
Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (first citing *Harris v. Ivax*

*Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999); then citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368–69 (11th Cir. 1997)).

H2 argues that Method refers to the Medispan and First Data Bank documents in its SAC when Method uses the term "databases" generally. (*See, e.g.*, doc. 159 at 5) ("H-2 was able to get its products 'linked' in various commercial and subscription databases . . . ."). Method also refers to these databases by name once in its request for injunctive relief. (Doc. 159 at 42) (requesting "an injunction enjoining Defendants, and all others acting in privity or in concert with them, from listing the H-2 Products in the industry price lists or databases, including Medi-Span and First Databank . . . "). Method contends that the exhibits contain disputed facts and that the exhibits are not referenced in its SAC.

Construing Method's allegations as specific references to the documents H2 attaches to its motion is, put simply, a stretch. Cantey's argument highlights this problem. Cantey states that "[a]ssuming Method intends to point the Court to forms sent to the government or third-party drug databases, a simple review of the actual market and government documents is permitted." (Doc. 191 at 9). The Court, however, declines to make that assumption at this stage.

Method contends that these documents contain disputed facts in light of the purpose for which the Defendants seek to admit the exhibits. Cantey argues that the DailyMed exhibits show that "[f]or these sophisticated purchasers, there could be no confusion that H2's products were prescription drugs with FDA approval." (Doc. 191 at 19). This conclusion, among others that H2 and Cantey ask the Court to draw from the exhibits, is disputed by Method. The Court thus declines to consider these exhibits under the

13

incorporation by reference doctrine. *Jackson v. City of Atlanta, Georgia*, 97 F.4th 1343, 1350 (11th Cir. 2024) ("When assessing the sufficiency of a complaint on a motion to dismiss, a district court has some 'discretion' to decide whether to consider 'matters outside of the pleadings.'" (citing *Jones v. Auto. Ins. Co. of Hartford*, 917 F.2d 1528, 1531–32 (11th Cir. 1990)).

### C.  Statute of Limitations and the Doctrine of Latches

The Defendants argue that Method's claims are time-barred by the statute of limitations and the doctrine of laches.  The Lanham Act does not contain a statute of limitations. *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 7 F.4th 989, 1005 (11th Cir. 2021).  Consequently, there is a "lack of clarity surrounding whether only a laches analysis applies to Lanham Act claims or whether a laches analysis and a statute of limitations analysis applies." *CoachComm, LLC, v. Westcom Wireless, Inc.*, 2023 WL 8376194, at *8 (M.D. Ala. Dec. 4, 2023) (citing *Solar Reflections, LLC v. Solar Reflections Glass Tinting, LLC*, 256 F. Supp. 3d 1248, 1255 (N.D. Ala. 2017)).  In *Pinnacle Advertising*, the Eleventh Circuit applied the doctrine of laches to Lanham Act claims and held that the statute of limitations period for analogous state law claims serves "as the touchstone for laches." 7 F.4th at 1005.  Other district courts have interpreted this decision to mean that the laches doctrine governs the timeliness of a Lanham Act claim, and while the statute of limitations for the analogous state law claim is informative, "it does not provide a rigid cut-off of claims outside the time period." *Solar Reflections, LLC*, 256 F. Supp. 3d at 1253; *CoachComm, LLC*, 2023 WL 8376194, at *8 ("Accordingly, the [c]ourt finds that the statute of limitations plays a role in the laches analysis, but that it is the laches

doctrine that governs the timeliness of a Lanham Act claim in the Eleventh Circuit.").  The Court agrees with this approach.

The parties disagree as to which state law claim is analogous to Method's claims. The Court does not reach this issue, however, because the Defendants' argument fails regardless of which statute of limitations applies.

To successfully assert the defense of laches, a defendant must demonstrate "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997).  Delay is "measured from the time at which the plaintiff knows or should know [it] has a provable claim for infringement." *Id.* at 1206.  Method alleges that by February 2020, H2 had changed some of its labels after Method alerted it to the false or misleading statements. (Doc. 159 at 28).  Thus, the earliest the Court could infer that Method was aware of its claims was by February 2020.  However, Method filed the instant case by September 2020. As to Cantey, the Defendants assert that Method "has always known that Ms. Cantey was H2's President," and the amendment adding Cantey as a defendant does not relate back to within the statute of limitations. (Doc. 191 at 7).  However, the proper question for purposes of the doctrine of laches under the Lanham Act is when Method knew or should have known that it had a provable claim for infringement against Cantey.  Method asserted in its motion to amend the complaint that it only became aware of possible claims against Cantey late in the discovery period, or sometime after May 2023, and the Court granted the motion in part on this basis. (*See generally* doc. 156).  The allegations in the complaint,

15

construing them in Method's favor, do not permit an inference that Method became aware of its claims against Cantey any earlier.  Method brought its claims against Cantey in December 2023.  Construing all facts in the light most favorable to Method, the Defendants have failed to show that Method delayed in asserting its claims, even in light of the one-year statute of limitations proposed by H2.

### D. Failure to Plausibly Allege a Lanham Act Violation

#### 1. *Counts One and Two: False Advertising in Violation of the Lanham Act Section 43(a)(1)(B)*

The Defendants argue that Method failed to state a claim for false advertising because "there exists no plausible allegation that H2 made any materially false or misleading statements," and that the "only damages alleged are not the result of any false or misleading statement by H2." (Doc. 188 at 22; doc. 191 at 9).  This Court previously found that Method stated a claim for false advertising in its opinion granting in part and denying in part H2's previous motion to dismiss. (*See* doc. 37 at 16–20).  But because this is Cantey's first motion to dismiss, the Court will examine the new arguments below.[5]

---

[5] The Defendants' argument that Method's allegations are implausible rests, to an extent, on facts not alleged in the SAC.  The Defendants argue, among other facts, that both Method and H2's products lack FDA approval, that Method's own actions constitute false advertising, that H2's practice of listing its products with NDCs is consistent with FDA practice, that "CMS is capable of understanding that fluoride supplements are not FDA-approved drugs," (doc. 188 at 37), that DailyMed did not require the disclaimer Method alleges was missing from H2's listings, and that H2 did, in fact, disclose on DailyMed that its products were not FDA approved.  This Court already found that "[t]he market's greater regulatory sophistication speaks only to the ultimate likelihood that Method's claims succeed on the merits," and, at this stage, "the Court is to take as true all factual allegations." (Doc. 37 at 20).  The Court also declined to consider the Defendants' exhibits to establish these facts and will not address these arguments.  The Court also declines to revisit arguments that these claims intrude on the FDA's authority, which were addressed fully in its earlier opinion. (*See* doc. 37).

To succeed on a claim of false advertising under the Lanham Act, a plaintiff must show that:

> (1) the defendant's statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) [the plaintiff] has been, or likely will be, injured as a result of the false or misleading statement.

*Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1196 (11th Cir. 2018) (alterations in original) (citing *Sovereign Military Hospitaller Order v. Fla. Priory of Knights Hospitallers*, 702 F.3d 1279, 1294 (11th Cir. 2012)).  To establish that a statement is false or misleading, the plaintiff must show that "the statements at issue were either '(1) commercial claims that are literally false as a factual matter,' or '(2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or are likely to deceive consumers.'" *Id.* at 1196 (citing *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004)).  When a court determines whether an advertisement is false or misleading, it must "'analyze the message conveyed in full context,' and 'must view the face of the statement in its entirety.'" *Id.* (quoting *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010)).

The Defendants first contend that Method's claims fail because Method omitted certain allegations.  H2 argues, for example, that "Method cites no statute or regulation preventing H2 from labeling its fluoride supplements with the letters 'Rx,'" and "[t]he statements Method claims H2 made . . . were not false as a matter of law." (Doc. 188 at 22, 24).  The Defendants also assert that "[a] number of cases have dismissed complaints for

failure to plausibly allege a false statement based on comparable allegations." (Doc. 188 at 35).

The Court finds these arguments unavailing.  First, Method does not need to allege that H2's statements were false as a matter of law or that any regulation barred the statements, only that the statements "implicitly convey a false impression, are misleading in context, or are likely to deceive consumers.'" *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d at 1196 (citing *Hickson*, 357 F.3d at 1261).  On these points, this Court's earlier opinion granting in part and denying in part H2's first motion to dismiss applies with equal force.  There, this Court found that "Method alleges that the pharmaceutical market, as a matter of fact, believes 'Rx' to mean the product is a prescription drug, and thus serialized. It also alleges that [H2's] products are not serialized. That simple juxtaposition is enough— Method adequately alleges a false representation." (Doc. 37 at 18).  Further, this Court noted that Method alleges that H2 "makes the literally false representation that its products have NDC numbers when they do not." (Doc. 37 at 19).

Finally, Method does not only allege that H2 merely omitted a disclaimer that its products are not FDA approved but also that this omission, when combined with the affirmative statements described above, creates the false or misleading impression that its drugs are FDA approved. (Doc. 159 at 30).  At this stage, Method's allegations remain sufficient to state a plausible claim for false advertising.

Further, in each case to which the Defendants cite in support of their argument, the court dismissed false advertising claims under Section 43(a) because no affirmative misleading statements were alleged, and the court found that merely placing the drug on

18

the market was insufficient to support a claim for false advertising. *See Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130 (4th Cir. 1993) (finding that the mere act of placing a drug on a market with standard package inserts is insufficient to allege an affirmative misrepresentation that a product is FDA approved); *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460 (D.N.J. 1998) (dismissing false advertising claims under Section 43(a) because they either sought redress for violations of the FDCA or did not allege affirmative misrepresentations); *Barr Lab'ys, Inc. v. Quantum Pharmics, Inc.*, 827 F. Supp. 111, 118 (E.D.N.Y. 1993) ("These allegations do not specify what falsehoods or misrepresentations, if any, were contained in the product labels or in the promotional literature.").  Method alleges that H2 did more than merely place its drugs on the market.  As explained above, Method alleges that the Defendants affirmatively made misrepresentations in their labeling and business dealings.

The Defendants next argue that Method "fails to allege that even a single customer made a decision to purchase H2's products as a result of the alleged reference to NDCs," and that "there is no allegation that [any] representation was false or that it caused any market participant to change its purchase decision." (Doc. 188 at 30; doc. 191 at 10).  The Court disagrees.  Method specifically alleges that H2's representations as to whether its products complied with certain federal requirements were false, and that pharmacists, pharmacies, wholesalers, buyers, and consumers chose H2's fluoride products over Method's fluoride products because they wrongly believed that H2's products comply with federal serialization requirements, and therefore were a proper substitute for Method's products. (Doc. 159 at 25–27).

The Defendants then argue that the statements that Method alleges it made "were neither statements in commerce nor were they material." (Doc. 188 at 22).[6]  Method's first claim for false advertising focuses on the Defendants' "promotions and advertisements with the Drug Databases," alleging that H2 "made its promotions and advertisements of the [H2] Products as prescription drugs that comply with federal serialization requirements in an attempt to link its products with the Method Products[.]" (Doc. 159 at 32).  The Defendants argue that the alleged misleading statements were not material because the statements would not have changed the databases' decisions to link its products with Method's. (Doc. 188 at 22–23; doc. 191 at 9, 11).  The Defendants assert that the databases only consider pharmaceutical equivalence in linking products.  Method, however, does not plead this fact in its SAC.  The Court thus declines to consider this argument, as it requires the Court to disregard the well-pleaded allegations in Method's SAC.  Further, while the Defendants claim that at least three different cases allow the Court to reject Method's claims as a matter of law at this stage, the cases cited comprise a motion for a preliminary injunction after an evidentiary hearing and two opinions decided on summary judgment, all of which were decided at junctures where the consideration of evidence is appropriate. *See U.S. Pharm. Corp. v. Trigen Lab'ys, Inc.*, 2011 WL 446148 (N.D. Ga. Jan. 27, 2011); *Belcher Pharms., LLC v. Hospira, Inc.*, 1 F.4th 1374 (11th Cir. 2021); *Concordia Pharms. Inc., S.À.R.L. v. Winder Lab'ys, LLC*, 2021 WL 3573118 (N.D. Ga. Feb. 17, 2021).

---

[6] The Court declines to address whether Method properly alleged that the false or misleading statements were made in commerce, as this statement is the extent of H2's argument on this element.  Neither H2 nor Cantey cite to any legal authority or provide any legal analysis on this issue.

## 2.  *Individual Liability as to Cantey*

Cantey argues that Method's allegations are insufficient to create individual liability.  Cantey states: "Method does not allege that a single prospective customer decided to make purchases from H2, as opposed to Method, because of anything Ms. Cantey ever said or did," and "Method does not specify when Ms. Cantey became president of H2 or during which period of time she is alleged to have 'authorized, directed, and participated in' any alleged misconduct." (Doc. 191 at 7–8).

"Natural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991).  "An individual is personally liable if she 'actively and knowingly caused the infringement.'" *Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1164 (11th Cir. 2022) (citing *Chanel, Inc.*, 931 F.2d at 1477).  It is insufficient "to show that the individual 'participated or engaged in some infringing act;' the individual must have 'actively participated as a moving force in the decision to engage in the infringing acts, or otherwise caused the infringement as a whole to occur.'" *Edmondson*, 43 F.4th at 1164 (citing *Chanel, Inc.*, 931 F.2d at 1477).  "In other words, 'a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity' is personally liable for that infringement." *Edmondson*, 43 F.4th at 1164 (citing *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994)).

In this case, the "infringing act" under the Lanham Act is H2's alleged false and misleading advertising.  Method alleges that Cantey directed and controlled H2's false and misleading advertising.  Method further alleges that Cantey completed and signed the

forms intended for Rx only products, sent written communications that contained false NDCs in offer letters, and that Cantey discussed the implications of the Rx symbols on product labels and ultimately approved their use.  The allegations point to more than mere participation, and instead are sufficient to allege that Cantey actively and knowingly caused the infringement.  The Court finds these allegations sufficient at this stage to allege a claim for false or misleading advertising against Cantey.

For the reasons stated, the Court finds that the motions as to Counts One through Two are due to be denied.

### 3. Count Three: Contributory False Advertising in Violation of the Lanham Act Section 43(a)(1)(A)

The Defendants argue that Method's claim for contributory false advertising fails because its underlying claim for false advertising also fails.  The Court already determined that Method sufficiently pleaded a claim for false advertising and finds that the Defendants' motion to dismiss as to Count Three is due to be denied.

### 4. Count Four: Unfair Competition in Violation of the Lanham Act Section 43(a)(1)(A)

In Count Four, Method alleges "unfair competition" in violation of the Lanham Act Section 43(a)(1)(A).[7]  The Defendants argue that Method failed to plead all elements of an "unfair competition" claim.  They assert that to prevail on an unfair competition claim, "a

---

[7] The SAC states that this claim is brought under Section 43(1)(1)(A), and the language of the claim pulls directly from Section 43(a)(1)(A).  Thus, the Court assumes that this was in error, and the claim is brought under Section 43(a)(1)(A).  And in any event, the claim is due to be dismissed for the reasons stated herein.

plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it 'such that consumers were likely to confuse the two.'" *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (citation omitted). The Defendants contend that Method has failed to plead that it has enforceable trademark rights in any mark alleged, including Rx or NDCs, or that H2's use of these marks was likely to confuse consumers between the two products.

Method contends that it is not required to allege rights to a unique mark and puts forth a different test. Method asserts that to prevail on an unfair competition claim, a plaintiff must show that the defendant "(1) uses a designation, (2) in interstate commerce, (3) in connection with goods, (4) which designation is likely to cause confusion, mistake, or deception as to (5) the origin, sponsorship, or approval of [the defendant's] goods, and (6) [the plaintiff] has been or is likely to be damaged by these acts." *First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.*, 923 F. Supp. 693, 707 (E.D. Pa. 1996). As explained below, although this standard tracks the language in Section 43(a)(1)(A), to prevail on a claim under this section also requires that the plaintiff have enforceable trademark rights in a mark or name.

Section 43(a) of the Lanham Act "allows one competitor to sue another if it alleges unfair competition arising from false or misleading product descriptions." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 106 (2014). All four of Method's claims are brought under Section 43(a). Supreme Court and Eleventh Circuit precedent counsel that "unfair competition" is merely an umbrella term for the types of claims that can be brought under

Section 43(a). *See Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d

1248, 1276 (11th Cir. 2015) ("[Section 43's] trademark protections and its prohibition on

false advertising are 'part of the broader law of unfair competition that has its sources in

English common law.'" (citing *Moseley v. v. Secret Catalogue, Inc.*, 537 U.S. 418, 428

(2003)); LANHAM ACT SECTION 43(A) CLAIMS, PRACTICAL LAW PRACTICE NOTE, w-005-

9404 ("Section 43(a) of the Lanham Act is the basis for several claims that courts and

commentators often lump into the broad category of unfair competition claims[.]").  The

Eleventh Circuit described Section 43(a) of the Lanham Act as containing two different

classes of prohibitions:

> one banning trademark infringement and one prohibiting false
> advertising. Each cause of action is a subpart of a single
> statutory provision, which reads this way:
>> (1) Any person who, on or in connection with
>> any goods or services, or any container for
>> goods, uses in commerce any word, term, name,
>> symbol, or device, or any combination thereof,
>> or any false designation of origin, false or
>> misleading description of fact, or false or
>> misleading representation of fact, which—
>> (A) is likely to cause confusion, or to cause
>> mistake, or to deceive as to the affiliation,
>> connection, or association of such person with
>> another person, or as to the origin, sponsorship,
>> or approval of his or her goods, services, or
>> commercial activities by another person, or
>> (B) in commercial advertising or promotion,
>> misrepresents the nature, characteristics,
>> qualities, or geographic origin of his or her or
>> another person's goods, services, or commercial
>> activities,
>> shall be liable in a civil action by any person who
>> believes that he or she is or is likely to be
>> damaged by such act.
> 15 U.S.C. § 1125(a).

*Duty Free Americas, Inc.*, 797 F.3d at 1275 (citation omitted) (finding that contributory false advertising is a cognizable claim under Section 43(a)).

Section 43(a) "thus creates two distinct bases of liability: false association, § [43](a)(1)(A), and false advertising, § [43](a)(1)(B)." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).   Method brings its claim of "unfair competition" pursuant to Section 43(a)(1)(A), or the prohibition on false association.

While some courts use different names for false association claims,[8] the understanding is that Section 43(a)(1)(A) is a vehicle for addressing the infringement of protected marks. *See e.g.*, *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1293 (M.D. Ala. 2019), *aff'd*, 6 F.4th 1247 (11th Cir. 2021) ("In the ordinary false-association case," a "plaintiff contends that the defendant used plaintiff's trademark to sell its own products." (citing *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1514 (11th Cir. 1984)).   The Eleventh Circuit has stated that

> [t]o establish a prima facie case of trademark infringement under § 43(a), a plaintiff must show "(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two."

---

[8] Some courts also refer to these claims as "false designation of origin" claims. *See e.g.*, *Advance Mag. Publishers, Inc. v. Chic USA, Inc.*, 2021 WL 664138, at *3 (M.D. Fla. Feb. 2, 2021), *report and recommendation adopted*, 2021 WL 662234 (M.D. Fla. Feb. 19, 2021) ("The same factors relevant to establishing the likelihood of confusion with respect to trademark infringement under 15 U.S.C. § 1114, apply equally to a false association and false designation of origin claim."); *Custom Mfg. & Eng'g, Inc.*, 508 F.3d at 647 ("Count 1 of [the plaintiff's] complaint alleged a claim pursuant to section 43 of the Lanham Act . . . . Specifically, [the plaintiff] alleged a false designation of origin claim."); *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 226 (3d Cir. 2017) ("Claims made under [Section 43(a)(1)(A)] are often called 'false designation of origin' or 'false association' claims.").

*Tana*, 611 F.3d 767, 773 (11th Cir. 2010) (citing *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 358 (11th Cir. 1997)); *see also Coral Ridge Ministries Media, Inc.*, 406 F. Supp. 3d at 1293 ("To survive the motion to dismiss [on its false association claim, the plaintiff] must plausibly plead that the use of its trademark created a 'likelihood of confusion' in consumers.").

The plaintiff does not need a registered mark to satisfy the first element of false association.  Instead,

> the use of another's unregistered, i.e., common law, trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source.

*Tana*, 611 F.3d at 773 (citing *Conagra, Inc.*, 743 F.2d at 1512–13).  "However, only those marks that are capable of distinguishing the owner's goods from those of others . . . are eligible for federal registration or protection as common law marks under the Lanham Act." *Id.* at 773.  "Generic marks, on the other hand, are generally incapable of receiving trademark protection." *Id.* at 774.

Method alleges that H2's false or misleading representations "have caused and are likely to continue to cause confusion or mistake, or to deceive prospective or actual customers and other members of the public as to the source, origin, sponsorship, or approval of [H2's] Products." (Doc. 159 at 41).  However, Method fails to sufficiently allege that it had protectable or common law trademark rights in the marks at issue, that the marks at issue distinguish Method's goods from others, or that H2 made false

representations that its products were associated with Method's.  Method also has not alleged that H2 "adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Id.* at 773.

The Court finds *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, (M.D. Ala. 2019), *aff'd*, 6 F.4th 1247 (11th Cir. 2021) instructive.  In *Coral Ridge*, the court found that Section 43(a)(1)(A)'s "requirement of likelihood of confusion as to the 'association of a person with another' means confusion as to whether the seller or the trademark holder is associated with another person or organization by virtue of a legal or other relationship." *Id.* at 1294.  The court thus dismissed the plaintiff's false association claim, which alleged that because its trademarked name was used on a "hate map" beside the names of other "hate groups," consumers would associate the plaintiff with those other groups.  The court noted that its conclusion was "consistent with the intent of Congress: [Section 43(a)] would cover the use of a trademark that falsely insinuates that a seller has a relationship with the trademark holder in order to sell products." *Id.*

Method alleges that H2's products are substituted for its own not because consumers believe that H2 has a relationship with Method, but because they believe that H2's products comply with certain federal requirements.  These allegations support a claim for false advertising, but not a claim for false association or origin.  Any confusion that Method alleges between H2 and Method's products is not of the kind that Section 43(a)(1)(A) is meant to protect.  Although Method's proposed standard tracks the language of the statute, the cases that use this standard and to which Method cites also interpret Section 43(a)(1)(A) to cover situations where a seller uses a trademark to falsely insinuate a relationship with

27

the trademark holder. *See AmNet Esop Corp. v. CrossCountry Mortg., Inc.*, 2023 WL 9181488, at \*7 (N.D. Ga. Dec. 18, 2023) (stating that "[a] false association or false designation of origin claim . . . 'occurs when a producer misrepresents his own . . . services as someone else's,'" where the plaintiff alleged that a loan officer led consumers to believe he was working with the plaintiff, when he was working for the defendant); *First Keystone Fed. Sav. Bank*, 923 F. Supp. at 699, 707 (analyzing a false designation of origin claim under Section 43 under the same framework as a common law trademark infringement claim, where both parties were informally referred to as "First Keystone").

For the reasons stated, the Court finds that Count Four is due to be dismissed against both Defendants.

### E.  Requested Injunctive Relief

H2 argues that the Court should apply a preliminary injunction standard to Method's claims for injunctive relief, and that "Method has not plausibly alleged the elements of a preliminary injunction." (Doc. 217 at 4; doc. 188 at 13; *see* doc. 188 at 54 ("Plaintiff has not shown a substantial likelihood of success on the merits of its Lanham Act claim[.]"). Cantey also argues that "[a] preliminary injunction is unwarranted," as "none of [its] elements are met here." (Doc. 181 at 22).  A request for a preliminary injunction is not currently before the Court, and the standard for a preliminary injunction is quite different from that of a 12(b)(6) motion.

The Defendants then argue that Method cannot enjoin third party databases from listing its products because they are not parties to this case and are not acting in concert with the Defendants.  Method requests an injunction "enjoining *Defendants*, and all others

28

*acting in privity or in concert* with them, from listing the [H2] Products in the industry price lists or databases, including Medi-Span and First Databank . . . [.]" (Doc. 159 at 42 (emphasis added)).  Method's request, as alleged, is limited to the Defendants and those acting in concert or privity with them.  The Court thus finds the Defendants' argument unavailing.

### F.  Method's Motion for Leave to File a Third Amended Complaint

On February 5, 2024, Method filed a Motion for Leave to File a Third Amended Complaint ("TAC") in the event the Court deems that any portion of the SAC is due to be dismissed. (Doc. 209).  Method seeks to file the TAC to "clarify and bolster Method's allegations that Defendants deliberately and intentionally mislead customers about its fluoride products," and asserts that "Method's proposed amendments should cure any pleading insufficiencies and meet the standard for pleading a complaint under Rule 8(a)." (Doc. 209 at 9, 11).  However, Method's proposed amendments do not address the pleading deficiencies addressed by the Court in this opinion, namely, that Method has not alleged sufficient facts to support a claim of false association or origin under Section 43(a)(1)(A). (*See generally* doc. 209-2).  Instead, Method's proposed amendments concern its claims for false advertising.  "A proposed amendment may be denied for futility 'when the complaint as amended would still be properly dismissed.'" *Coventry First, LLC v. McCarty*, 605 F.3d 865, 870 (11th Cir. 2010) (citing *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007)).  The Court thus finds that Method's motion (doc. 209) is due to be denied.

## V.  CONCLUSION

Accordingly, for the reasons stated, and for good cause, it is

ORDERED that the Defendants' Motions to Dismiss (docs. 188, 191) are GRANTED IN PART to the extent that Count Four is DISMISSED with prejudice as to both Defendants.  The motions are DENIED in all other respects.  It is further

ORDERED that the Plaintiff's Motion for Leave to File a Third Amended Complaint (doc. 209) is DENIED.

DONE this 26th day of April, 2024.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE